Good morning, Your Honors. May it please the Court. I'm Chris DeHart, and I represent Gloria Giannini in this case. And in this case, pre-plea constitutional violations is what she is alleging is the basis for why she should have been allowed to withdraw her plea. The two pre-plea constitutional violations, she received the ineffective assistance of counsel, and that ineffective assistance of counsel was based on the plea agreement in the Northern District. The contract principles that must be applied to a plea agreement from the Northern District are constitutional in nature when it applies to a defendant in a criminal case. Well, you know, it seems to me like when I looked at the record, there's some substantial evidence that if there was an allegation of ineffective assistance, it might have been engineered by your own client. It seems like she was hiring and firing lawyers and claiming she was going to pay them and then didn't pay them. A lot of stuff going on here. She was hiring. She was trying to find an attorney that would actually go to the Northern District and obtain the transcript of the hearing. And her first court-appointed counsel, she kept telling people the check was in the mail and the check never was in the mail. I mean, isn't that what the record says? I think that's a red herring. I think there were instances when that occurred. Well, most lawyers like to get paid. I agree attorneys like to get paid. She asked her court-appointed attorney, Joseph Wiseman, to go to the Ninth Circuit and obtain the transcript to investigate what her allegation was. He did not do that. She obtained a private attorney, David Silber. She made that same request. Would you please go to the Northern District, obtain that transcript, and determine what happened. He didn't do that. They both testified to that, so we know they didn't do that. There's no gray area there. She wrote a letter to the court saying, this issue has been resolved in the Northern District. Could you please verify this? The judge did nothing. It's unclear what else she is supposed to do. She's making these requests to her attorneys, and they're not following through with them. Well, that's not entirely true, counsel. They both went, said that they went and looked at the original claim in the Northern District and then compared it with the indictment, and that both of them came to the same conclusion, which is that they bore no relationship to each other. And I agree that they did that. However, that's not what this issue is about. The argument isn't that those charges were filed and dismissed in the Northern District. The argument is that the plea agreement, the terms of the plea agreement that the government promised not to pursue any other charges. Now, I read the plea agreement. I didn't see anything in the written plea agreement. I'm talking about the plea agreement in the Northern District. There was no written plea agreement. It was simply done on the record because it was a supervised release violation. Okay. And so the government there does say, we agree not to pursue any other charges stemming from this investigation. And neither Mr. Weisman nor Mr. Silber ever obtained that transcript, and so they had no ability to know what the terms and conditions of that plea agreement were. And it's hard for me to understand how they could draw a legal conclusion of the impact of that plea agreement when they don't know what the terms of it are. To this day, do we know what the terms are? Well, we know what was written or what was ---- Oh, I've read the transcript. Correct. That's all that we know. Okay. We don't know anything further. Correct. Even after all this time, all we have is this one statement. That's correct. And it's the defense position that, according to Clark, a case that's relied on heavily by the government, an evidentiary hearing should have been held to determine whether there was a meeting of the minds, what the parties believed to be relevant. The AUSA and the Northern District, he didn't submit a declaration. He didn't testify. In Clark, the AUSA did, in fact, testify to what he believed the terms and the relevant conduct was at issue in that plea agreement. But we don't have that in this case. There is a vast amount of evidence that the government provided through discovery that shows that the U.S. Probation Office believed that Ms. Giannini was engaged in fraud, that an investigator working for the U.S. Attorney's Office in the Northern District by the name of John Willing did an investigation. And we don't have the discovery from that investigation, though. But we have his statement in an affidavit in support of the search warrant that indicates he spoke to individuals. He determined that she was engaged in fraud. So we know that the U.S. Attorney in the Northern District was aware of fraud allegations. Yet he made a decision, based on the information that he had, that he wanted to resolve the supervised release violation for 21 months, and he agreed as part of the bargain to not pursue any other charges stemming from the investigation. Scalia. Weren't these dates different, though, didn't the indictment for which he stands, for which this appeal involves, for periods of time that were different? Actually, the investigation in the Northern District continued up and through December of 2004. It's not ñ well, were the charges that were laid in this indictment the same allegations in her supervised release violation? They're not specifically the same, no. Okay. But they overlap in that one of the allegations ñ Both involve fraud? Yes. Oh, okay. The allegations in the supervised release violation is that Ms. Giannini created the companies of W.H. Ranch and Einar and Associates. So she created those and didn't tell the probation officer. That's a violation. In the case in the Eastern District, the government alleged in the plea agreement, in the factual basis to support the plea agreement, that Ms. Giannini created those entities to perpetrate the fraud, to further the fraud against R.L. Andes. So they overlap. They are part of the same investigation, and they are part of the same overarching conduct. And as I think I believe I pointed out in my reply brief, when the government said in the Northern District, we agree not to pursue any other charges stemming from this investigation, he's necessarily referring to something that's not already before the court. What you're saying is that she got blanket immunity, not even use immunity, blanket immunity. Well, the government did agree that they would not pursue those charges, and they were well aware of fraud, or they had a perception that there was fraud. Okay. So then she was totally immunized. She could go on and commit additional fraud as long as it was covered by whatever ñ if they started an investigation, she could just continue her fraud, and it would be okay. No, Your Honor. The agreement occurred on January 10th of 2005, and from that point forward, she's not covered by anything. On that point forward, she's on her own. But the investigation that led to the filing of the petition, and the petition was filed in December of 2004, so anything that happened up until 2004 is covered. After December 2004, no, all bets are off, she's on her own. But anything that happened prior to December of 2004 is covered. But you've acknowledged to me that the conduct for which she was prosecuted for her supervised release violation is separate and distinct from the conduct for which she has been indicted in this case. No. I will not ñ I will not say it's separate and distinct. It overlaps slightly. It is not exactly the same. It does overlap. It overlaps in that ñ Because they're both fraud? I'm sorry? Because they're both fraud. No. No, Your Honor. Okay. Because, as I stated, I believe it's charge 18 of the petition says, this is the supervised release violation, that says she's in violation because she created these two corporations or two companies. That's part of the Eastern District factual basis for their plea, was that she created these two companies. So charge 18 from the petition, the factual basis from the plea agreement, cover the same conduct. Likewise, I believe it's charge 1, 2, and 3 address her conduct in going to the ñ traveling from the Northern District to the Eastern District to access the funds that she has received from R.L. Andes. Now, I see I'm down to about a minute of time. I have one question for you before your time ends. Doesn't the fact that Mr. Andes, who I believe is the government's principal witness or the victim in their fraud case, the fact that he died before your client moved to withdraw her guilty plea mean that the court did not abuse its discretion in not allowing her to withdraw the guilty plea based on ineffective assistance of counsel because the government could be prejudiced? No, Your Honor, because the basis for the motion to withdraw the plea and the basis for the motion to dismiss is that she is essentially legally innocent of those charges. Those charges have been addressed and are covered by the plea agreement in the Northern District. Thus, regardless of whether the witness has died, whether there's prejudice to the government, that's not relevant to this. And prejudice to the government cannot trump Ms. Giannini's right to the effective assistance of counsel and cannot trump her right to have the government abide by the argument that it made in the Northern District in December of 2004. So in December of 2004, when the government said, it's our position that they said, we agree, we will not pursue these charges against you. So then the argument is when we get to the Eastern District ---- But if you look at the violation of supervised release, those whatever it is, 18 counts, most of them just don't have anything to do with anything. They have to do with traveling to Redding. They have to do with ---- mostly with insufficient funds. And most of them are, in the big scheme of things, at least compared with the fraud that she was perpetrating on Arial Andes, were just minuscule. These are technical violations. The only thing she pleads is to one charge of NSF. I agree with that. I absolutely agree with that. The point here, though, is that I think the record is fairly clear that the government in the Northern District was investigating Ms. Giannini. U.S. Probation Officer Mark Rinalp was doing it. Marius Greenspan from the Postal Service was. IRS Inspector Joe Camelucci. They were all investigating. And John Willing, who worked for the U.S. Attorney's Office. They were investigating her for fraud. They made a decision to not charge those for whatever reason. I don't know that because the government didn't present any testimony or any affidavit from the prosecutor in the Northern District. I'm sorry. Remind me who the attorney was. Who was her attorney at the time? Who was her attorney in the. In 2004. In the Northern District. Richard Weiss was his name. Okay. And has he provided a declaration or an affidavit or. No, he has not. And why is that? We actually, it was our position that we needed to get all the discovery from the Northern District case before we could fully litigate the motion to dismiss. And we needed that information to know what was in the. Right. I agree that further information might have been useful. But a phone call or something else to Mr. Weiss or some kind of a preliminary declaration might have led to, might have given the district court here some insight that he apparently didn't find. Well, the information is actually in the discovery that the government provided about what they were investigating in the Northern District. It was, I mean, it's explicit. Yeah, but if you're, but you're now asking, as the district court said, he wasn't, wasn't, he decided that the, he decided the term investigation he didn't think was I'm curious as to whether you've ever pursued the extrinsic evidence in the form of the attorney for Ms. Giannini in the Northern District. I have not done that. But we don't, so Mr. Weiss is available and nobody's spoken to him to find out whether he has any recollection of, of this, of this vast conspiracy against Ms. Giannini. I don't think that's, no, he has not provided a declaration. You presumably only have two people on your side who know what, who know what's going on, which would be Ms. Giannini and, and Mr. Weiss. Correct. And you haven't spoken to Mr. Weiss and the district court didn't think Ms. Giannini was credible. And, and I, I, I find that troubling because on the day of her arrest in January of 2007, when she was arrested on the Eastern District charges, as she's sitting in the backseat of, of the car with the law enforcement agents and they read the complaint to her, the first thing she says is, these issues, these charges have been resolved in the Northern District. So this is not a woman who, who spent time. She's, she's clearly very bright. Trying to. She's pulled off some pretty sophisticated fraud here on a lot of people. And that might be true, but I, I find it challenging to believe that she would come up with that immediately. Well, it's, I mean, it is, it is curious, but that's why it makes it all the more curious to me that we have no, nothing whatsoever from Mr. Weiss. And, and I believe that in this situation, it needs to be remanded for an evidentiary hearing should be held, one, to have the prosecutor review the prosecutor's file to determine what, if anything, they knew when they knew it. The investigator, John Willing, from the U.S. Attorney's Office in the Northern District, did a complete investigation. He interviewed, he says, several witnesses. We don't know who those were. There's an allegation that Mr. Andes spoke to someone from Oakland. It's possible Mr. Andes spoke with the investigator from the Northern District and they were aware of Andes, because they do go on to investigate Mr. Andes. That's a speculation. We don't know that. We don't know that, but it's, it's a reasonable inference because there is evidence that the agents were investigating the relationship between Ms. Giannini and Mr. Andes. So something promoted them, prompted them to investigate the relationship between Ms. Giannini and Mr. Andes. So it's not as though there's no evidence. There is evidence that they were doing it. And I think it should be remanded for a full evidentiary hearing so that we can hear from the prosecutor to determine what exactly was the scope of the agreement. Okay. Thank you, Ms. Hart. You're way over your time. I will allow you one minute to respond to the government. So let's hear from the government now. Good morning, Your Honor. Steve Lapham from the United States. I was the assistant who handled the case below. Your Honor, you have three motions before, three issues before you, the recusal, the motion to withdraw, and the motion to dismiss. Chronologically, the motion to dismiss came last, but I think that's the appropriate place to begin because that will impact the motion to withdraw and the question of ineffective assistance of counsel. There was one issue that Judge Garcia found dispositive on the motion to dismiss, and that was the fact that this scheme continued beyond the TSR violation. TSR violation was in December of 2004 and January of 2005. That's when she, Ms. Giannini, pled guilty to that. The record clearly shows that Mr. Andes continued to be defrauded by Ms. Giannini through July of 2006. Well, that was the question that I asked your opposing counsel. I asked that specific question, and I said, well, does this give her some sort of blanket immunity for further misconduct? And I think that's exactly the issue because Judge Garcia went through the Soto Olivas case and he went through the Clark case to try and determine what the plea agreement said. But his dispositive ruling, what he said removed all those other issues from the case, was that whatever the northern district prosecutor did, he didn't give her prospective immunity for any and all crimes that she might commit in the future. And she did continue to commit these crimes, and that's clearly demonstrated in the record. But how do we know, counsel, what it means exactly when the government agreed, I guess, in the oral plea agreement, at the probation violation, when it said that they agreed not to pursue any other charges arising out of the investigation? It sounds like they found, I mean, without even conducting an evidentiary ---- full evidentiary hearing, based on what's in the record, that they found some materials that clearly had some connection to Mr. Andes. And how do we determine what that means? Well, they found a lot of material about a lot of different individuals who were apparently being defrauded. But including Mr. Andes? Including Mr. Andes. All right. Right. And I think the problem with that is that you can't draw a straight line from Mr. Andes' name showing up in some of the documents to the conclusion that he was defrauded. The fact is this was a TSR violation investigation, not as probably extensive or well-rounded as a full criminal investigation would have been. And what we do know is that Mr. Andes' name didn't pop up in those 18 TSR violations that the government chose to go on. Well, not specifically, but there were inferences of fraud that were referenced in those 18 violations, weren't there? Well, I disagree. There were – I mean, it's not even close. Mr. Andes was the victim of a $4 million fraud. The TSR violations consisted of quite a few travel violations, traveling outside the district without authorization, failure to provide necessary information, a lot of bad check charges, nothing that came even close to a $4 million fraud. But what the probation officer stumbled upon, I mean, in that hotel room where the whole supervised release occurred, included materials that were relied upon in your investigation. No. No, no, that's not true at all. Is that in the record that it didn't? Well, my – my investigation, this – Well, but is that in the record? We don't really know, then, do we? Well, I believe it is. Let me think about this. My investigation started in 2006, and it didn't start with me getting any contact from the northern district or from the probation officer. In fact, I never had any contact with that individual except to make inquiries when this issue arose. My case came to me from a private attorney who represented Mr. Andes who said he'd been the victim of a $4 million fraud. Well, and so you didn't get any information from that hotel room as part of your investigation? I don't believe so. Is that anywhere in the record, or are you telling us that for the first time here? I don't believe that issue ever came up in the court below, except my statement's very similar to what I just said to you about how the origin of the case began. I do know that Mr. Weissman, one of the defendant's attorneys, testified on the stand that he had been in touch with that private attorney, Mr. Andes' attorney, and had been told that that's how the case started as well. If I am correct that the motion to dismiss was properly denied because of Judge Weissman's testimony, and that this issue was dispositive, that the scheme continued into 2006, then the motion to withdraw the guilty plea crumbles as well, because that was founded on the ineffective assistance of counsel claim. Two attorneys with a great deal of criminal experience between them both testified that they looked at this issue, did not believe that there was any preclusive effect by that northern district adjudication on the eastern district case. And at least Mr. Weissman testified that part of his reasoning, he had three reasons, but one of them was that the criminal conduct continued after the TSR violation. So he was dead on accurate on that. But even if those two attorneys got the answer right, but for the wrong reasons, it's still the same conclusion, that there was no ineffective assistance of counsel, and that is not a basis for withdrawing the plea. Sotomayor, are there instances where a government's promise in another district not to pursue charges elsewhere, rising out of an investigation, that would bar the future cases, correct? Yes. There are instances. So in this case, if the previous lawyers who are representing Ms. Gianni were wrong when they told her that an agreement in one jurisdiction could not foreclose prosecution in another jurisdiction, and I guess we don't know exactly, except for what you're, you know, saying here today that it didn't, but let's say it's possible that it did, wouldn't that constitute, in and of itself, a reason, a fair and just reason for withdrawing her guilty plea if they gave her just completely wrong information? No. No, I don't believe so, Your Honor. And there I think we get back to the Clark case, this Court's opinion about what is meant by the word investigation. I think that's directly on point. Well, but the Clark case is really distinguishable from this case. I mean, I think in the reply brief, the defense of Mr. Giannini's lawyer set out a table distinguishing the two cases. What's your response to that? Well, the basis for that table, the distinctions are basically that there was more evidence obtained in that case. The AUSA testified in evidentiary hearing. Judge Garcia didn't feel that was necessary, again, because he found the continued criminal conduct to be dispositive. He didn't think further discovery or further evidentiary evidence taking was necessary. But before he got there, he did talk about the Clark case, and he said that he didn't believe that or he thought that Clark case controlled on that particular issue. And I think that was the right conclusion. The standards of review, we haven't talked about that yet, but the standard of review on this issue is findings of fact, which this Court has said includes the meaning of plea agreements, is reviewed for clear error. And I think Judge Garcia's decision on that point holds up very well under that clear error standard. The final thing in the last 45 seconds I have that I want to talk about is just on that motion to withdraw the plea. Your Honor, I think you touched upon it, the issue of the prejudice to the government, because this is very suspicious, that the motion to withdraw the plea was brought, I believe, 8 or 10 months after the plea and just a few weeks after Mr. Andes died, and he was the critical witness in the case. If this – if the government were precluded from calling Mr. Andes, the case goes away, because we can't prove it. I see I'm out of time. Sotomayor, I have just one last question. If we find that the plea agreement is ambiguous, that oral statement that the government made at the supervised release hearing, shouldn't it be read in favor of Ms. Giannini? Well, remember, Your Honor, this is an oral plea agreement. It's a very informal process for TSR violations. There's no written plea agreement, and it – I don't think the ordinary contract rules apply in this type of case, but if they do, as I indicated in the brief, I think the first and foremost rule of contract is, was there a meeting in the mines? And it doesn't appear that there was a meeting in the mines if you dig down and look at what was actually charged. Mr. Andes' crime does not appear anywhere even close to those 18 counts that were charged in the TSR violation. So when the prosecutor says that we're going to dismiss these other 17 counts and not pursue other charges, I read that to mean other charges on those 17 counts, not whatever else may be out there in the ether. Thank you. Thank you, Mr. Latt. Ms. Hart, you have a minute. I need to clear up a couple of misstatements. One has to do with the continuing criminal conduct that Your Honor had asked about. If you look at the indictment, the charges in the indictment, the last act charged is July 30th of 2004, prior to the plea agreement in the Northern District. If there was a count charged in the indictment in the Eastern District that occurred after that date, we would be in a different position. There is not. While they make the argument that the criminal conduct continues to be in the Northern District, there is not. But what is Judge Garcia talking about? Is he just completely out of the outer space somewhere? I think he's referring to things that are in the Northern District that are not charged, items that are not charged. It could be considered relevant conduct, but it's not charged conduct. So these charges would have to be dismissed. If the government wanted to then file charges based on conduct that occurred after January 2005, this argument, I don't believe, holds water. But that's not the situation we're in. That's the first thing. The second thing, to say that the government didn't have this information is completely incorrect. The 1,200-plus pages that I received in discovery came from the government. The government provided those to us. All of the documents that I've been to. But that doesn't necessarily show that the Eastern District had the documents that the Northern District had. Yes, because Mr. Latham gave them to me. Well, yes, but that doesn't demonstrate that he used them in the investigation. If he's – if you've requested the documents and the government has an obligation to produce it, it has to – Mr. Latham is going to have to go to the Northern District to produce the documents. That was the evidence that I – the discovery I got from the initial discovery from Mr. Latham. That's what he provided to me. I did not ask him for those. That's what was in the discovery. So to say that they didn't have it is incorrect. They did. And to talk about the specific – You're out of time. Is there something else that must be corrected? No. I'll submit. Thank you very much. All right. We thank both counsel for the argument. Jeanne is submitted.
judges: Ezra, Bybee, Murguia